The next argument for today is No. 21-911, Slattery v. Cuomo. Thank you, Judge Park. May it please the Court, Matt Bells for the Evergreen Association and Christopher T. Slattery. This is a quintessential freedom of association case. The Evergreen Association exists to convert the culture by opposing and preventing abortion. The District Court agreed. The State does not challenge at this point that Evergreen Association is an expressive association. We have a law, Section 203, known as the Boss Bill, which says that if one of Evergreen's pro-life counselors, one of their employees, has an abortion, Evergreen can take no action to distance itself from that employee, despite the fact that her decision is completely in conflict with Evergreen's mission and reason for existence. The Supreme Court in the J.C.'s case said, quote, There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members that do not desire freedom of association, therefore plainly presupposes a freedom not to associate. I have a question about standing, if we could just start there. Is there today a credible fear of enforcement of this statute against Evergreen? I think absolutely. I think the cases we cited were the Supreme Court case, Babbitt, and the two Second Circuit cases were mostly Hedges v. Obama and Cayuga Nation, I think. I think the Second Circuit is on the record as having a, quote, low threshold for pre-enforcement standing. And I think the quote we cited was something like, unless it's a moribund law that has no risk of, you know, there's no sign that the government's going to enforce it. What would be the basis of an enforcement investigation that you're fearing? Well, the risk is that a situation does come along, and then our client, a nonprofit organization with five to seven employees, is subject to a private right of action with tremendous risk of damages. And at that time, arguably, you would have an injury. But I guess my question is, from here until then, what is your injury? It's a pre-enforcement standing case that we can't risk. Well, you right now have a policy that says that any of your employees, if they engage in abortion or certain kinds of contraception or other reproductive choices, they would be subject to discipline, right? Because you have this code for your employees. That's absolutely correct. Now, the law – does the New York State law require you to change that policy right now? Well, that's a good question. So now are you allowed to tell employees that they're going to be subject to discipline if they engage in abortion or contraception or other – these other forms of conduct? No. We can't – we would not be allowed to do that. There's, in fact, what's called a no – So there's at least a chilling effect on, you know, your ability to maintain expressive association right now, isn't there? That's right. And we also – we're in our complaint on the record stating that we're going to keep – our client's going to keep acting in accordance with his faith. The law says even if you propose to commit a violation of the law, you can be subject to action. I think that that's taken literally – my client's already in violation of the law. Well, you're not – I mean, is it a violation of the law just to say that that's what you're going to do? I mean, you're not actually in violation of the law until you try to dismiss somebody or subject them to disfavorable employment status in response to engaging in that conduct, right? I might be taking – Or maybe that's a question. I might be – Does New York State come and tell you you can't even maintain this policy? Maybe that's an aspect of its enforcement. Maybe you can tell me whether that's true. Yeah, I might be taking the language too literally, but I think when the law says you cannot propose to commit a violation of this law, that if we're saying we're going to keep doing what we're doing, I think that's now a violation as we stand here today. I mean there's also a provision of the law that says that you need to – well, I guess it says if you provide an employee handbook to employees, you need to provide notice of these rights and remedies. I take it – I mean I don't know. Are you subject to that? That's correct. We don't have a handbook. My client doesn't have a handbook. So you are actually continuing to tell employees that they cannot engage in abortion or certain forms of contraception and so on, right? That's part of my client's employment practices, yes. Okay. And that is inconsistent with the law requires? I believe so, yes, Your Honor. Okay. Can I also ask you – and I'm going to ask your adversary as well – of your understanding of the first, I don't know, paragraph one, I suppose, of the law, which says an employer shall be prohibited from accessing an employee's personal information of certain types. Is it your understanding that asking an employee for that information verbally is accessing? Your Honor, I think the most straightforward way of understanding that phrase or applying that – to me, the easiest way to access someone's personal health information is probably to ask them about it. And I think that restricts that ability. So that's one of your concerns, is that even asking them constitutes accessing? I think that's true, yes. Is that term defined – I don't see it anywhere defined here, but do you see – was there any other provision of New York law – I don't recall anything being brought to our attention that defines what accessing means. I don't believe it's defined, Your Honor. There's an important case in the Second Circuit called New Hope that you may be familiar with. It was decided last year where this court said that, quote, compelled hiring like compelled membership may be a way in which the government mandate can affect in a significant way a group's ability to advocate public and private viewpoints. Evergreen has pled facts along these lines, and according to the Supreme Court in Boy Scouts v. Dale, courts must, quote, give deference to an association's view of what would impair its expression. I think that's the big issue in this case, and I don't think there's any indication that the district court employed any deference. It certainly didn't state that it was doing so, and I don't think there's – the state's offering – Well, the district court thought that there wasn't an impairment of your expressive activity because you could still express whatever views you wanted, right? The district court ended up saying that it sort of agreed with us but thought the burden was incidental, I believe, is the language the district court used. My point is – Well, the state says you can still hire and fire people based on their advocacy positions on abortion and other issues. Why isn't that enough to protect your expressive association? Well, Your Honor, I think – I don't want to sound too Midwestern, but I think the phrase actions speak louder than words. If we've got an employee who is counseling a woman and praying with a woman about the virtues of carrying this baby to term and things like that, and while she's doing so, she's acting in the complete opposite way, having an abortion, that's a problem, especially if that client finds out. That completely undermines the mission. I think from Chris Slattery's – I kind of understand the state's position in this case to be, well, if your employee was not willing to say that that was a mistake or that it's not advisable for other people, you could fire her on that basis. I can't imagine that's true. I can't imagine my client facing an enforcement action and saying, well, I didn't fire her because she had an abortion. I fired her because after she had an abortion, she didn't really talk about it in the way I want to. So I was actually firing her for speech. I just can't – I think that's a dangerous, dangerous position for my client to be in. Right. So when the state says that it only is about the underlying conduct and not about one's advocacy position or one's express position, you think that that's just not a sustainable line? I think – I would worry about the advocacy – Do you think that the statute doesn't draw that line or you think you don't trust the state not to draw that line when they enforce it? Or what is the actual risk? I mean is it the scope of the statute or is it the way the state is going to enforce it? Oh, I think it's the scope of the statute as enforced by the state. But – well, can I ask you this? If, in fact, we had confidence that the state was only going to enforce it with respect to discrimination on the basis of the underlying conduct and not the advocacy positions, would that protect your expressive interest? Would that statute be okay if there were confidence that it was not going to be enforced, that you could hire and fire somebody based on their willingness to advocate for or against abortion and their public statements about abortion even if you couldn't discipline somebody for having obtained an abortion? I think the action has to – the actual action of having an abortion has to be something my client can discuss with the person and make a decision on. I think Chris Flattery is looking at this, the president and founder, is looking at this and saying I've got to have sincere messengers out there. Our counselors have to be sincere. And he's got a risk of looking at this and saying so even if the statute did draw that line or the state was drawing that line into enforcement, you still think it would violate the rights of the person associated with it? Absolutely. Absolutely, Your Honor. The complaint on free exercise, the complaint alleges that the purpose of the law was religious targeting. What specifically can you point to that supports that allegation? Sure, Your Honor. You know, I think at this very early stage we've got – I think we've got some leeway on how much evidence we're supposed to have at this point on religious targeting. But I think we've got a lot. Yeah, well, I guess all I saw in the complaint, maybe I missed something, is paragraph 127 to 30, which just says generally the purpose of the law. Right, we talked about targeting. I think more of our evidence was discussed in briefing in the district court level and has been briefed here. We allege targeting. We allege that they were hostile to religion. We allege that they had no – when asked on the legislature floor if there were any actual examples of this kind of discrimination happening, the legislator could cite no examples. I think that goes to both compelling interest and what some of the other states do. Well, that doesn't show you that there's targeting of religious groups, right? Right. So what evidence is there of the targeting? I mean in the floor debates, there's a reference to Hobby Lobby. So I guess that is a reference to a religious employer, and the state seems to not want that to happen. But that might just be one example of some broader conduct. So how do we know that the legislature really was targeting religious employers as opposed to employers generally? Sure. A few things. Like you said, on the Senate side, the boss's main sponsor, Jennifer Metzger, declared that the boss bill was in response to employers, quote, exercising religion, end quote, in the Hobby Lobby line of cases, which she called a, quote, dangerous slippery slope. A Supreme Court case was a dangerous slippery slope. End quote. The New York State Senate's website states that, quote, the boss bill that was passed will prevent an employer's religious beliefs from infringing on women's health care decisions, end quote. And finally – wait, sorry, where is that quotation from? That's from – the New York State's website has various descriptions of sort of celebration of the bills that were passed. I should note this bill was passed on the 46th anniversary of Roe v. Wade, and it was done so intentionally. That's also a celebrated fact if you look at the website. But there's no question that it does protect an employee's right to engage in abortion. The question is whether it was doing so specifically against religious employers. Right. And I think – I've cited a couple statements where they expressly mentioned the exercise of religion as being something they're trying to prevent. And even in the official cleaned-up legislative memoranda – that's at JA 98 to 100, I believe, somewhere around there – the bill's sponsors prepared that, and the state used it to show neutrality in the district court. They referred again to the Hobby Lobby line of cases. I think there can only be one way to look at a reference to the Hobby Lobby cases is you're looking at religious employers who are reciting their RFRA rights and saying that was a problem. They called – this memoranda calls that, quote, legal loopholes that allowed these employers to do what they were doing. The legal loophole there was RFRA. It was religious freedom. I mean I think that's what they're referring to. I guess I'm just trying to track how much of what you're saying to us is in the complaint. Aren't we in the posture right now – aren't we in 12b-6 land? Your Honor, I'll say that – Let me just back up. Is that the posture we're in? Yes. Yes. So I guess my question is at what point should we be looking at only things that are cited in the complaint or, I suppose, as to which we could take judicial notice? Because I think some of the things you're mentioning, they may be out there, but they're not in the complaint, right? That's true. So could you just – just to go back a little bit to maybe Judge Park's question, what do you have in the complaint? Because we're not in summary judgment motion, right? We're not after a trial in merit. What is there in the complaint or other documents as to which we may properly take notice that were incorporated by reference in the complaint or whatever that we can consider there? So could you just direct our attention to that? Sure. I don't have the cites. I think we cited – we alleged religious hostility and religious targeting. As I said – Well, I think the point is what allegations do you have to support that allegation? The three or four statements that I've made about them specifically targeting religion as our evidence, I don't think much of that made it in the complaint. The only thing I think was about the lack of evidence for the bill, which I think goes hand in hand with the – Well, I think the legislative history is something we can pay attention to. I would hope so. So we have the comment about Hobby Lobby from Senator Metzger that you mentioned. That's part of legislative history. What about there is a colloquy on the assembly side about whether religious exemptions would be included? I mean is that – does that show that we're targeting a religion or just the decision to apply it across the board? I mean does that show us that it's targeting religious employers? What do we do with that material? Right. I think it was – I think it was Jennifer Metzger. I don't remember which one, or Ellen Jaffe said that we're acknowledging a problem with the religious issue. She said that the ministerial exemption could come into play, and she said – So why doesn't that cut the other way? So if they're saying, well, we're going to apply it across the board, but, of course, religious employers can invoke the ministerial exception. And so that would be a defense that they have, and so we think we're taking care of religious interests. Why wouldn't that mean that they're not targeting religious employers? Well, I think it was – I think it was an acknowledgment of a problem, first of all. But second of all, simply acknowledging the ministerial exemption doesn't help anybody. It's not saying we're doing something for you. It's saying you can – if we prosecute you, you can go to court and maybe you'll fit as someone under the ministerial – under Hosanna Tabor. But I think the acknowledgment of a problem is probably the most important part from our point of view. Do you think it shows animus on the part of the legislature that they say the religious issues need to be raised as a defense, but they're still going to be subject to a complaint? I think acknowledging that there's a problem between this statute and religious employers, combined with some of the other evidence I've pointed to, certainly shows a problem. I also – the New Hope case says that even legislative history should be viewed in a light most favorable to the plaintiff. And even a slight suspicion of religious animosity warrants a pause for discovery before dismissal. And I think that's appropriate in this case. I've reserved three minutes. Thank you, counsel. Yeah, you've reserved three minutes for rebuttal. We'll hear from the State. Mr. Brody. May it please the Court, Frederick Brody for appellees. Section 203e furthers two important State interests, combating discrimination and protecting employee privacy. This piece is here on a motion to dismiss. The complaint concerns an unusual entity that exists for the purpose of opposing abortion. The narrow question before this Court is therefore whether these particular plaintiffs have adequately pleaded any of their claims. Now, plaintiffs could have sought in the district court to amend their complaint to include additional facts, but they did not. And they could have asked this Court to remand with leave to amend, but they did not. So plaintiffs are standing on the complaint that's in the record. And that complaint does not state a cause of action on any of their four claims. Before we get to the merits, can I ask you about standing? Could the State today prosecute Evergreen? Well, let me start with the word prosecute, because plaintiffs say it. Bring an enforcement action. I mean, I'm not trying to quibble with what specifically, but I would like at the end of this a yes or no answer. And I think that's a criminal statute. Typical procedure at DOL is that someone makes a complaint to the agency. Then the agency investigates it, they send a letter, and then if there is truculence on the part of the other side, then they exercise their prosecutorial discretion and either they do or do not bring an enforcement action. None of that has happened, and none of that is even alleged in the complaint. Well, this statute also authorizes a private right of action, right? It does. So anybody could sue them. So if it turned out, I mean, I understand maybe this is the piece that you might say is speculative, but if it turned out that there was an employee who engaged in abortion and Evergreen wanted to subject that employee to disfavorable employment treatment, that person could sue immediately, right? Yeah, that person would have a cause of action. So, I mean, doesn't that make the threat of enforcement more credible? I mean, in the Susan B. Anthony list, didn't Justice Thomas say that because there's a private right of action, it means it's more likely that somebody is going to be subjected to enforcement under a statute as opposed to when enforcement is reserved to a state agency? Well, I'm not sure. Well, going back to the pleading. Maybe it's not likely enough, but that at least makes it more likely, right, because you don't have to wait for a complaint filed with the state and the state deciding to bring an enforcement action, anybody could sue. It makes it theoretically more likely. Now, does the complaint allege that any employee has made a complaint about discrimination? No, it doesn't. The complaint further does not allege that Evergreen intends to discriminate or to retaliate against. So sometimes we've said that you have standing when there's a chilling effect, I remember we had a Vermont campaign finance case, and the state of Vermont said, we're not going to bring an enforcement action against issue advocacy. But then we nevertheless said there might be a chilling effect because they're worried about enforcement. So is it right that right now the policy that the Evergreen Association has, where they tell employees you'll be subject to discipline if you engage in abortion or contraception or other activities, that's unlawful, right? And they are maintaining a policy that violates New York State law. Well, let me address that policy specifically. There's a critical admission in the reply brief at pages two to three. They say that we do not, Evergreen does not have a blanket policy of discriminating against people who have had abortions. Instead, they say it depends on the circumstances. So what does that do to standing? It means that we don't know. It's speculative whether they will ever violate the law because it's going to depend on the circumstances. Well, that's an interesting point, so I'll explore that in a second. But then let's just make this a hypothetical. Let's say they did in fact have a policy that said if you engage in abortion, you'll be subject to discipline or dismissal. They would not – that would be in violation of current New York State law, right? And if that were part of their expressive association, it means there's at least a chilling effect from New York State law on their expressive association. Chilling effect, arguable. Policy, I don't think it violates because it says an employer shall not discriminate or take any retaliatory personnel action against an employee with respect to compensation, et cetera, et cetera, because of or on the basis of reproductive health decision-making. So it's talking about actions. The employee has to do something, and then the employer has to do something in response. And that's what makes – that's what – So you're saying that in order to have an injury, we have to wait for somebody at their – at the immigrant association to have an abortion and seek to stay employed while the employer seeks to fire them? Well, typically one has to wait until there's a violation, and then there's an actual dispute. Well, you have to wait unless there's a credible threat of enforcement, right? Unless there's a credible threat of enforcement, and there's no credible threat alleged here. The State has not enforced against Evergreen. Or I should add, I checked with the Department of Labor last week. The State hasn't enforced against anyone else. So, counsel, can I just ask you section 1? I asked your opposing counsel this question. It says an employer shall be prohibited from accessing an employee's personal information in a certain list. And then later on it says an employee may bring a civil action for anybody who's violated the provisions of this section. And I take this section to include paragraphs 1 and 2, right? Right. So what does it mean to access personal information? And let me get to one example. In your view, would it violate paragraph 1 if Evergreen, Mr. Slattery, were to ask an employee, tell me about your reproductive decision making? Is that accessing personal information in violation of paragraph 1? Well, paragraph 1 says reproductive health decision making including, but not limited to. Yeah, yeah. No, I know that. So if they ask, if the employer asks, what contraceptives are you taking? Have you had an abortion? Yes, that would violate paragraph 1 because that's obtaining the information. And so then you can have the employee can sue, correct? The employee would not have any damages at that point, but they could theoretically sue. Okay. And you could, you, the State, could then take an enforcement action, right? The State could theoretically take an enforcement action. And if they state in advance, these are the questions we plan to ask of our employees, under paragraph, could you, the State, then bring a pre-enforcement or an action to obtain injunctive relief because they propose to commit a violation? Theoretically, that could happen. But I would say, again, there's no pleading here that any of that has been done. No, no, and it hasn't happened yet. But they've said that that's their plan, right? That when they hire people, they'd like to ask these questions, right? Well, if you look at the complaint closely, Your Honor, what it says is we ask people, are you pro-life or pro-choice? Nothing in this statute prevents an employer from asking an employee, are you pro-life or pro-choice? And nothing in this statute prevents an employer from hiring only pro-life employees. And how do you, and how are you restricting their ability to measure whether one is pro-life or pro-choice? You have to ask them, what is your view? Can you ask them, how in your life have you acted, and to judge whether the person is being sincere? I think, you know, employment lawyers will tell you, Your Honor, that there are all sorts of questions that employers cannot ordinarily ask in an interview, race, sex, pregnancy, a whole line of things, sexual orientation. You just don't ask. And that would be, this statute would put your reproductive health decisions on that order. It is not a great burden for employers not to ask about someone's medical history when they hire them. In fact, that's the general practice, I would believe, and I would say it's an incidental burden at most. I guess I'm just wondering when you say it's not a burden because they're free to ask about their beliefs, but you're saying that they're not allowed to ask basically follow-up questions that would be, one would imagine, would be most probative of testing the sincerity of those beliefs. They're not allowed to ask about the employer, the employee, the potential employee's private health decision-making. And then just to be clear, then, we're also talking, because this says employee, I take it from our discussion that your view is that this statute also prohibits all of these same things, these actions, with respect to prospective employees with hiring. Well, we have a footnote in our brief that says that's an open question. Because you've got a definition in the labor law that says an employee is someone who works for an employer. So that would not seem to be... Well, you're the enforcement authority, so what's your view? Maybe you're wrong. Maybe the New York courts would tell you you're wrong. But presumably you have a view. Well, look, the Department of Labor has not come to a view on the question of whether it includes potential employees. But I would suggest that's an open question. So the state's... So you're saying that it could encompass hiring and not just current employers or employees? That hasn't been decided. So you're saying we can't tell from the text of the statute whether it prohibits certain hiring practices or governs hiring practices at all? Right. We have a footnote in our brief, and it's somewhat discursive, and it says that's an open question. And if you look at the labor law, there is a definition of employee in there. And the question is whether that definition would necessarily include potential employees. And DOL has not answered that question. We don't have any case law. But I would suggest that on a motion to dismiss, when the state has not answered and, again, the things the court are pressing me for are things that might come out and answer. But when the state has not answered, it's not appropriate for a court to resolve those questions at most. Well, if it went to standing, we would have to resolve it, like whether there's a credible threat of enforcement. If they think that their hiring practices might be subject to this law, then maybe they'd be justified in worrying about that because the state hasn't said they're not subject to enforcement. Right? And then I guess there's also maybe with respect to the vagueness challenge, whether, you know, if a statute might or might not govern hiring practices, maybe there's a problem there about how specific the statute is. Right? Well, as to vagueness, I was intending to rest on the brief. But a statute isn't void for vagueness when it's clear what the statute as a whole prohibits. So the statute as a whole prohibits discrimination and retaliation based on how decision-making No, I understand. I mean, maybe it doesn't make it, but that would be something you're acknowledging, that the statute is vague as to whether it governs the decisions to hire somebody. DOL hasn't come to a determination on that, and you would need litigation to find out. Can we back up a little bit about the sort of conduct expressive expression distinction? So you're saying basically that there isn't a First Amendment right to ensure that people in your expressive association engage in certain conduct,  Right, you know, if we think about, like, context in religion, like let's say New York State had a law that said you can't discriminate, you can't fire somebody on the basis of their dietary choices, and, you know, a Hebrew school has hired somebody to teach someone the kosher dietary laws. You're saying we might say they have to tolerate that person eating pork chops every day in front of the students, but as long as they agree to tell them that they can't do it, it wouldn't impinge on the expressive association of, you know, the Hebrew school? I mean, doesn't expressive association, doesn't it often involve conduct and not simply external speech? And hasn't the Supreme Court told us that? The pork chop example, the person sitting there in a temple eating a pork chop, and it's visible to the employer, so the employer sees it. I mean, here we've got conduct, which is usually private, you get a prescription, you get a medical procedure, or you get IVF or some other fertility. But it's not always private, right? So would you acknowledge that if it was not kept private, that the employer found out, then it does impinge on the expressive association? Well, What if the employee disclosed it to the employer or talked about it? If the employee discloses it, then we have the distinction that the employer cannot discriminate based on the employee's conduct. But if, and the example was given about what about someone who has an abortion and then goes back to work counseling people not to have an abortion, the employer can watch that person's work and see whether I understand that the statute is like a don't ask, don't tell policy, so you can't fire somebody because they had an abortion, but if they come back to work and tell people they had an abortion, then you can fire them for that reason, for telling people. Well, when we say you can fire, it's a narrow statute, and it only protects conduct, and it only protects the conduct of going to I mean, do you understand the concern that the appellants have, that it seems like that's a pretty unstable line? Like are the state enforcement, I mean, the state regulatory authority is going to say, well, okay, you're not actually firing the person because she had an abortion, but you're firing her because she mentioned it to somebody at work, and that is a legitimate basis for firing somebody? I mean, is that a stable distinction? I'm not saying that you can fire someone for mentioning it. You can fire someone for advocating something that I thought we were dealing with a hypothetical where you said that the reason that my pork chop example didn't work is because it was knowable to the employer, but in this case it's usually private. But I'm saying, well, what if it's not private? What if it's mentioned? And you said, well, then it would be different, and you could fire the person. But you're saying you couldn't fire the person for mentioning it at work. You can't fire the person for counseling someone, doing their job badly, counseling someone in a way that's contrary to the organization's mission. You could fire someone for that. You could fire someone for speaking publicly. The example we used in the brief is writing an editorial in a newspaper or an online post. So if it turned out that somebody had an abortion, then the Evergreen Association could ask that person to tell everybody it was a mistake. And if they're not willing to say that, consistent with the mission of the organization, they could be fired for that reason? Well, no. If they have an abortion, the first question is, how does the employer even find out? Well, in my hypothetical, the person didn't keep it a secret, mentioned it to somebody. So let's just do away with that concern. The employer didn't do anything intrusive to find out, but it got found out because the person mentioned it. So that's not a concern. The question is, once they know that somebody had an abortion, you're saying they can't fire someone for that reason, but they could fire someone for whatever they say about it. So New York State's position is that under this law, you could fire someone for not saying that their abortion was a mistake. Well, the law is very limited. So the law protects only the conduct that's referenced in the law. So if someone engages in speech, that's not protected by this law. It might be protected by something else, not protected by this law. Right. And it's also the refusal to engage in speech, right, because you say in the briefs that the employer could require an employee to engage in advocacy that's consistent with what the employer wants, right? They need to be vocally pro-life, right? So if somebody had an abortion and they're not willing to say it was a mistake and I regret it, then you're saying they could be fired for the unwillingness to say that. Is that right? If the employee does not effectively communicate the employer's message, they can be fired for that because their job is to communicate a message. However, it's not a job requirement. So you're saying this statute can only be enforced when the thing actually – when the abortion, underlying abortion conduct remains entirely secret from the employer and they're firing them anyway? But if the employer finds out about it and asks the employee to say it was a mistake and I don't think it should really be allowed, you could fire them for that, for refusing to say that. I think arguably a plaintiff's lawyer could say that's retaliation. I don't know how that could play out in the courts. It's entirely speculative that any such – Okay. So then we don't know actually. So maybe it would be prohibited, right, as retaliation or just as a violation of the underlying substantive provisions. You would have to look at the circumstances. And again, we're dealing here just with a complaint. There's no probability alleged that any of those circumstances are actually going to happen. There's no record of enforcement in New Hope. But we're going to – that's a separate question about whether it's going to happen. I understand that. There's a standing question. But this is about whether the statute impinges on rights of expressive association. And your position in the briefs was, well, even though you can't fire somebody because of the underlying conduct, you can fire them because of their refusal to engage in speech that the organization believes in, to communicate the message of the organization. But now, based on this colloquy, you're suggesting, well, maybe the statute would prohibit the employer from requiring that the employee say that the abortion was a mistake or that abortion shouldn't be allowed. Because the difference is, in that hypothetical, making the employee say, my abortion was a mistake publicly or to clients is a duty that is not imposed on other employees. And that's what might make it retaliation because you're saying – But that's their whole point, right? So their whole point in the expressive association claim was it violates our rights of expressive association if we can't subject an employee to discipline for violating our policy with respect to abortion-related conduct. And you say, no, that doesn't affect your right to expression because you can require the employee to say or do whatever is consistent with the mission and can't fire them. But now you're saying that actually it might be retaliation if you do that, so it might be prohibited. So doesn't that undermine the argument that this law doesn't affect the expressive interests of the Evergreen Association? Well, I'm saying it might be because, again, the circumstances matter. And we don't have any circumstances pleaded here. But the circumstances might be that the employer imposes a duty on the employee that's disparate, that's harsher than the duties that it imposes on every other employee. So the question is, is the employee doing their job as opposed to – Okay, but if in my hypothetical everybody is required to say that they oppose abortion or that abortion should not be permitted or that it's a mistake, then it would be applied equally. It just so happens that there's somebody who had an abortion, right? And so maybe what they say is slightly different because they have to account for their own experience. But it's still a requirement that everybody take that position, right? So you're saying that would be allowed? Under this statute, the employer remains in control of their message. Okay. Can I ask another question, which is about the neutrality of the law? So the statute says you can't take an adverse personnel action on the basis of the reproductive health decision-making, including a decision to use or access a particular drug, device, or medical service. Now you say an employee could dismiss – it protects against an employer who wants to dismiss an employee for getting an abortion and also an employee who didn't get an abortion, right? And that makes it neutral. But the statute says use or access a drug, device, or medical service. It doesn't say use or not use or a decision with respect to that. So doesn't the statute seem directed at getting the abortion, not the refusal to get an abortion? Well, it protects fertility enhancement techniques. It's neutral in that sense that you can do things medically that prevent you from having a baby. You can do things medically that make it more likely that you will have a baby. And both of those are reproductive health decisions, and both of them are protected by the statute. In fact, the legislative history, the assembly people and Senate people, one of them specifically mentions IVF, in vitro fertilization, as something that the statute would protect. So are people being fired for getting in vitro fertilization? If Your Honor reads the brief of the NYCLU amicus brief, they cite a couple of examples where that happened. So the answer is yes. Okay. But on the abortion question, so you're saying it's neutral because there are – it's neutral between making fertility more likely or making a pregnancy more likely and ending a pregnancy. That's the neutrality you're talking about. Right. It doesn't matter whether you want a child or whether you don't want a child. And who has objections to IVF? Are those also religious objections? I believe there are religious objections to IVF. So if we're asking whether it's neutral toward religion and irreligion, right, secular religious reasons, is it neutral with respect to that? I mean, it sounds like you're saying if you have a religious objection to abortion, you can't discipline an employee on that basis. And if you have a religious objection to IVF, you can't discipline an employee on that basis. But what are the secular applications where it's prohibiting conduct by employers? Well, secularly, IVF is a very costly procedure, and it results in employee absences. And I believe these are the two examples cited in the NYCLU brief. It's a secular employer that said – I think one was a bar that says, look, if you're going out for fertility treatments, we don't want you here anymore. You're fired. So it's a money saver if you can fire everyone who gets it. Okay. So it does – I see. So it's about secular reasons for doing that. But you don't actually think that there are people – there are employers out there who are firing people for not getting an abortion, right? Who are firing people for pregnancy? Right. Absolutely. Well, for pregnancy, that's already prohibited, isn't it? It's not prohibited to the extent that – the prior prohibitions had holes in them. One hole was that federal law, if you're an employer with less than 15 people, the pregnancy discrimination laws did not apply. 203e applies to everyone. And as far as IVF goes, this Court, we cite the decision in our briefs. There was a 2003 decision from this Court where you held that employment discrimination law, federal law, doesn't protect IVF, doesn't protect assisted fertility. So this State law steps into that. And pregnancy in particular. You're saying that also the protection to prevent somebody from being fired for getting pregnant, that's covered by this statute and inadequately covered by other statutes. Is that right? That's what I just said, yes, Your Honor. Okay. Let me go back briefly to the standing question, if I could just try my question again. Can the State, without an employee complainant, bring an enforcement action against Evergreen today? Based on what we know, I don't think they could because there's no instance. Does it have the authority to do so? Well, there's no instance of retaliation or – So you would need a complainant? You would need some instance of discrimination or retaliation that's threatened, you know, in order to get the injunctive relief, which is what I think Your Honor is referring to. So is your answer no, that the State could not today, without somebody complaining, without any facts of a specific case, bring an enforcement action under this law against Evergreen? There is no factual basis for doing so. Including everything that the plaintiff has alleged in the complaint, taking everything that's true, including their intent, and this is my interpretation, their intent to fire anybody if they were to find these things out, you would say that at this stage of the game, even knowing that that is their intent, as opportunities arise, you could not presently bring an action against them? The State hasn't brought that. No, I know that. Right, right. So I'm sorry. Are you capable of answering that question, yes or no? Maybe I phrased it wrong, and tell me why I phrased it wrong. But is the State, in your view, presently taking every allegation as true in the complaint, incapable or unauthorized to bring an enforcement action against them  that's, I think, a yes or no question? Yes, but let me clarify why. I'm sorry. Yes, but. Wait. That's yes as to unauthorized or yes as to authorized? Yes as to unauthorized. As to unauthorized. Okay. But I have to clarify why. It's because of this critical admission that I referred to earlier on pages 2 to 3 of the reply brief, that they don't have a blanket policy of discrimination. They don't have a blanket policy of retaliation. And it's going to depend on the circumstances. So. Okay. But if they had such a blanket policy, you would say that the State could bring an enforcement action right away? Well, the. So it depends on what you say is the critical admission on pages 2 to 3 of the reply brief. The blanket policy is one, is step one. Step two would be some sort of factual situation that would bring the blanket policy into effect. And there's no such. Can we break these down? Because my question was without a complainant, without a person. I thought the answer was no was what you're getting at. And now you're pointing to a policy and that's in my mind a separate question that does not depend on a person complaining. One moment, Your Honor. I just want to check the wording of this injunctive provision. That in a civil action alleging violation of the section, a court may afford injunctive relief against any employer that commits or proposes to commit a violation of the provisions of the section? Right. No one's proposed. So if they have a policy that says we are going to fire anybody who gets an abortion, would that be proposing to commit a violation of the statute? I think that's too abstract. You would need someone, some complainant who is actually being discriminated against. Is that true in general? Well, does the Department of Labor take the position that unless you have a live complainant, you cannot take an enforcement action against a company that proposes openly to? If they had a policy that said we propose to violate section 203B, period, I incorporate by reference 203B, period. That's their policy. And no one has come forward. No one has written you a letter. You have not heard of any particular employees. Everybody at Evergreen actually seems to be very happy. Are you saying that in that circumstance, the Department of Labor is unauthorized to bring an enforcement action against them? Now, putting aside your discretion about whether you feel like doing it or you think it's an appropriate deployment of resources, if they have a policy that says it is our policy to violate 203E whenever we can, as opportunities arise, in your view, does the state have authority to seek injunctive relief against them? They have authority to investigate. And assume that they find that they have a policy that says, as I spoke, we intend to violate 203E every time we can as soon as the opportunities arise. That's what your investigation yields. Answer to that is yes. Answer to that is also not in the complaint, which only says we ask people whether you're pro-choice or pro-life, which is not prohibited by the statute. Answer is also not according to the reply brief because reply brief says we don't have a blanket policy. It depends on the circumstances. So can I ask just one other question? Because you had mentioned before that the statute protects against employers who want to fire an employee for getting pregnant. The language of the statute is not take an adverse personnel action on the basis of the employee's or dependent's reproductive health decision-making, including but not limited to a decision to use or access a drug device or medical service. Now in your briefing, you said the reason why we know that doesn't reach expressive activity is because the clause that says limited to a decision to use or access a drug device or medical service limits what we're talking about in terms of reproductive health decision-making. But that language doesn't encompass pregnancy. So you're reading a lot more into reproductive health decision-making than the decision to use or access a drug device or medical service, right? No. Getting pregnant might not involve any drugs, devices, or medical services, right? Right. But getting pregnant often does involve drugs, devices, or medical services. Oh, so wait. So are you saying that the statute protects against adverse personnel actions because of the use of IVF, or it also protects against an employer who wants to fire somebody simply for getting pregnant? Does the statute reach that far? Getting pregnant without drugs, devices, or medical services? Yeah. Well, I suppose visiting one's doctor for a regular pregnancy checkup. But these employers that fire somebody for getting pregnant are not doing it because the person visited a doctor. It's not like they're proponents of natural childbirth or something. They're doing it because the employee has gotten pregnant and it's going to take that person away from work. So just getting pregnant, you're saying it's not covered by the statute. So it really is about accessing drugs, devices, or medical services. That's what the statute says, yes. Right. Okay, so it would only protect against the scenario where somebody got pregnant through IVF and the employment action was because of the use of IVF. No, because if you have an employment action based on pregnancy, pregnancy wouldn't have happened but for IVF. I'm giving you a scenario where there's no IVF. Somebody just got pregnant and the employer wants to fire that person. This statute doesn't prohibit that. Maybe other statutes do, but this one does not. And again, pregnancy involves checkups, medical visits, checkups. It's not done without doctors. Assume that it didn't. No, I'm serious. Because I'm a little confused because I thought before you were arguing that this was designed to plug gaps in protection for, among other people, people who become pregnant. That there's federal law that bars pregnancy discrimination for employers with 15 or more people and that this now extends that protection to all employers in New York, right? Wasn't that your argument? I thought so. So let me just stop. Okay, I thought that was your argument. Now I'm hearing you say it does not protect for discrimination based on pregnancy. It protects against discrimination based on the seeking of, I guess, health services that are related to pregnancy? But it would be okay under this law to discriminate against a pregnant woman, but it would not be okay to discriminate against them because they got, I don't know, some kind of health care that was related to the pregnancy. The people who passed the statute, based on my reading of the legislative history, thought that it was going to cover pregnancy as a general category. So I can only assume that they meant pregnancy without the aid of IDF to fall within the phrase including but not limited to. Reproductive health decision-making, including but not limited to. Okay, so now we're taking the position pregnancy, period, is a protected basis here, regardless of whether you also go to the doctor, ever. Home birth, you're completely, you know, you're a natural person. You don't believe in any sort of medical intervention. You're just pregnant. Is it your view that this statute would protect someone in those circumstances from any retaliation in connection with employment? It's obviously a question that hasn't been addressed by DOL or the courts. Looking at the language of the statute, it says reproductive health decision-making. So the question Your Honor's raising is whether pregnancy without more would fall within including, excuse me, including but not limited to. Right, that's my question, yes. I know what my question is. I'm trying to get the answer. Standing here today without guidance from DOL, without a case, I can't tell you that. But the argument in your brief about why the Evergreen Association is still allowed to require employees to have certain professed views about reproductive health decision-making was that this language about including but not limited to limited the phrase reproductive health decision-making, right? You said because that language limits the phrase and expressed views about reproductive health are not like the use of a drug, device, or medical service. It's not included in the statute. But now you're telling us that actually maybe there's a category of things it prohibits that are unlike the use of a drug, device, or medical service. Doesn't that undermine your argument that the statute is really concrete and we know what it means? Or your argument that it doesn't restrict the expressive activity? No, it doesn't undermine the argument because talking about things, speech is in a different category from actually the conduct of becoming pregnant. So your argument is just that pregnancy is more similar to the use of IVF than believing in abortion is to getting an abortion. Is that right? That's right. IVF results in pregnancy. But everyone who supports abortion rights does not necessarily themselves have an abortion. You just see that there's a close connection between believing in abortion rights and utilizing abortion services. I think many more people, including males, believe in abortion rights than would actually utilize them or could physically utilize them. Okay. Thank you, counsel. We've kept you way over your time. We'll hear from Mr. Belz for three minutes for rebuttal. Thank you, Judge Park. Just a couple notes. One on the pre-enforcement issue. I think my opposing counsel stated that this was not a criminal statute. It's my understanding that a violation of labor law, and we pled this in paragraph 59 of our complaint, a violation can be prosecuted as a criminal offense. Can I ask you about what the state said was the key admission on pages two to three of your reply brief that you do not have a blanket policy that says that employees who engage in abortion services or other prohibited conduct would be subject to discipline? Sure. We pled that we will terminate someone if they have an abortion, and that is the policy. What we say in the reply brief is, and I think this would be common with most companies, they're not necessarily bound by that policy. And my client reserves the right and wants the right to sit down with someone and say she had had an abortion ten years ago. She may say, I regret that decision. I want to help women avoid that decision if they can in the future, and I'll do everything in my power to help Evergreen. And that may be the best messenger that Evergreen could have. That's not uncommon, I don't think, in the pro-life counseling world. So I think my client wants to reserve that right, and that's what we said in the reply brief. It wasn't that we were abandoning our policy. Okay, I understand that. Could I ask you also about this question about the neutrality of the law? So the state says, well, it protects against treatments that make pregnancy more likely as well as treatments that terminate a pregnancy, the IVF and abortion, and that makes it neutral. And now we also have the argument that maybe it also protects against discipline for getting pregnant itself. So why doesn't that show that there's a lot of secular applications of the law, and so therefore the law is neutral? Well, a couple things. My present counsel said that federal law has protected pregnancy discrimination, but there's a hole in it for employers under 15 employees. I think he's ignoring some state law that has come in New York that has remedied that. I believe it was 2016, New York passed something adding to discrimination laws about workplace accommodations for pregnant women. I think in 2020, I don't have a site, but there was a Pregnancy Discrimination Act or something along that that closed any loopholes about any sort of pregnancy discrimination. So going back to federal law and saying there's a loophole is ignoring state law. On the IVF issue, I don't know how developed discrimination on the basis of IVF is anywhere, but it came up. Well, what about this idea that there are some employers who want to fire somebody for getting IVF because it takes them away from the office for too long and the law will stop that conduct, and that is a secular discrimination. It's not a religious discrimination, and the law covers that. Well, also there's a case called Gavori that we cited that actually says IVF, the discrimination on the basis of in vitro fertilization is protected. I'm not sure what basis it's protected under, but that was the finding in Gavori. I also just, I think I'd like to see, you know, if we get into the evidence, I'd like to see some evidence from the state. It's the state's burden when we get to strict scrutiny. I think we've got, you know, a fairly low burden in just providing a suspicion of religious hostility, and I think we need some evidence that some of this discrimination is actually happening. So you think that if you survive a motion to dismiss, you might come forward with evidence that, in fact, the state is targeting religion. What would that evidence look like? Well, I think we could probably get into more communications among legislators about the basis of this, you know, what was the motivation. Private communications between legislators? Excuse me. Like their e-mails? Absolutely. Yeah, that kind of thing. But more so we would ask for evidence of, you know, there's, I think in the compelling interest analysis, you need data and you need evidence that there's an actual problem in need of solving. I think that's the quote. So we would seek information about that actual problem. Is there an actual problem that this law is solving? With regard to any of the types of discrimination, it seeks to remedy. Thank you, counsel. I will take the case under advisement. The last case for today is on submission. That concludes our calendar. I'll ask the courtroom deputy to adjourn. Court is adjourned. Thank you.